IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA,                                No. 3:18-cr-00168-HZ-1

               Plaintiff,

     v.

DENNIS G. MERKEL,                                        OPINION & ORDER

               Defendant.

Sandra Moser
ACTING CHIEF, FRAUD SECTION
United States Department of Justice
Jennifer Ballantyne
Emily Scruggs
TRIAL ATTORNEYS
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Ave. NW
Washington, D.C. 20530

      Attorneys for Plaintiff

/ / /

/ / /

Per A. Ramfjord
Andrew Ho
STOEL RIVES LLP
760 S.W. Ninth Avenue, Suite 3000
Portland, Oregon 97205

Wendy J. Olson
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, Idaho 83702

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Defendant Dennis Merkel is charged with two counts of Major Fraud Against the United States in violation of 18 U.S.C. § 1031. On December 14, 2018, I heard oral argument on three motions to dismiss and a motion to strike surplusage from the Indictment. I ruled from the bench on three of those four motions but took the motion to dismiss based on the statute of limitations and/or pre-indictment delay, under advisement. *See* Dec. 14, 2018 Min. Ord., ECF 52. This Opinion explains my reasoning for denying that motion.

      Pursuant to Federal Rule of Criminal Procedure 12(b)(1), Defendant moves to dismiss the Indictment because the charges are barred by the applicable statute of limitations. Alternatively, he argues that the Indictment should be dismissed based on pre-indictment delay that violated his Fifth Amendment due process rights. Rule 12(b)(1) generally provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Cr. P. 12(b)(1).

I. Factual Background Relevant to the Motion

      On April 17, 2018, the grand jury returned the Indictment charging Defendant with two

counts of major fraud against the United States, arising out of the alleged alteration of tensile test results on two orders of aluminum extrusions sold by his employer, Company A, to two customers that were subcontractors to entities that had prime contracts with the United States. ECF 1, 2. Those test results were transmitted on May 20, 2002, nearly sixteen years before the Indictment.

The Indictment alleges that Defendant was the production manager for Plant A beginning in or about 1986. It also alleges that Plant A was acquired by Company A in 2000. On April 2, 2002, Company A agreed to sell aluminum extrusions to Customer A, which was a subcontractor to an entity that had a prime contract with NASA dated October 28, 1998. On April 9, 2002, Company A agreed to sell aluminum extrusions to Company C, which was a subcontractor to Customer B, which had a prime contract with the Missile Defense Agency dated January 1, 2001.

The Indictment alleges that Defendant was part of a scheme which existed over a ten-year period ending in about December 2006. As Defendant notes, this is approximately twelve years before the Indictment was returned.

II.  Statute of Limitations

The major fraud statute has a seven-year statute of limitations.  18 U.S.C. § 1031(f). Defendant acknowledges that the seven-year period can be extended under certain circumstances by the Wartime Suspension of Limitations Act, 18 U.S.C. § 3287 (WSLA).  Defendant argues, however, that the 2002 version of the WSLA, the statute that was in effect when the charged conduct allegedly took place, does not extend the period here and further, that the 2008 version does not apply retroactively.  The Government does not appear to dispute that the statute of limitations begins to run on the date of the charged executions of the offense which is May 20,

2002.  But, it argues that the 2008 amended version of the WSLA applies retroactively and thus, the charges are timely.

Before its 2008 amendment, the WSLA provided that "[*w*]*hen the United States is at war*[,] the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, . . . . shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress."  18 U.S.C. § 3287 (1948) (emphasis added).  Before 2008, meaning under the original 1948 version of the statute, the WSLA applied "only when the United States was at war."  *Kellogg Brown & Root Servs., Inc. v. United States, ex rel. Carter*, 135 S. Ct. 1970, 1974 (2015).  Defendant argues that because there has been no formal declaration of war since the date of the alleged offenses involved here, May 20, 2002, the applicable version of the WSLA at that time would not have extended the major fraud statute's seven-year limitations period.  Defendant contends that although the United States was engaged in military activity in Afghanistan beginning on October 7, 2001, and in Iraq as of March 30, 2003, Congress did not declare war in either instance and thus, the WSLA was never triggered.  Because the United States has not been in a declared state of war since the offense date of May 20, 2002, Defendant argues that the pre-2008 WSLA cannot be applied to extend the statutory limitations period.

Defendant relies on *Kellogg Brown & Root* for the proposition that the pre-2008 WSLA tolled the statute of limitations only when there was a formal declaration of war by Congress. The Court did not so hold, however.  Instead, it expressly declined to resolve the issue.  135 S. Ct. at 1978 & n.4 (holding that because the case involved civil claims, the WSLA did not

suspend the applicable statute of limitations under either the 1948 or 2008 version of the statute; explaining that "[t]his holding obviates any need to determine . . . whether the term 'war' in the 1948 Act applies only when Congress has formally declared war").  As a 2014 district court case observed, there is conflicting authority regarding whether the pre-2008 version of the WSLA was triggered by the Congressional Authorizations for the Use of Military Force (AUMF) in Iraq and Afghanistan with some courts holding that these conflicts did not implicate the pre-2008 version of the WSLA because there was no formal Congressional declaration of war and others reaching the opposite conclusion.  *United States v. Arnold*, 991 F. Supp. 2d 1307, 1314 (S.D. Ga. 2014) (discussing cases).  Nonetheless, the Government here does not rely on the 2002 version of the statute and given the conflicting law on the "formal declaration of law" issue, I decline to further address the issue.

The Government contends that the charges are timely under the 2008 amended WSLA. In 2008, the WSLA was amended to apply not only when the United States was at war but also "whenever Congress has enacted 'a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. § 1544(b)).'"  *Kellogg Brown & Root*, 135 S. Ct. at 1974 (quoting 18 U.S.C. § 3287 after 2008 amendment).  The Government cites to two specific Congressional AUMFs in which Congress cited section 5(b) of the War Powers Resolution:  one for the War on Terror, Pub. L. No. 107-40, 115 Stat. 224 (2001), and one for the operations in Iraq, Pub. L. No. 107-243, 116 Stat. 1498 (2002).  Thus, both of these "conflicts" trigger the post-2008 WSLA's tolling of the statute of limitations.  Additionally, the 2008 WSLA amendments extended the WSLA's tolling period from three years to five years. *Kellogg Brown & Root*, 135 S. Ct. at 1976.

Several cases have applied the 2008 amended WSLA retroactively as long as the original statute of limitations had not expired at the time the amendments were adopted in October 2008. In *Arnold*, a case involving criminal charges to which the WSLA could apply to toll the statute of limitations, the court made several determinations relevant here. 991 F. Supp. 2d at 1314-17. First, the court agreed that the AUMFs directed at the use of force in Iraq and Afghanistan in 2001 and 2002 triggered WSLA suspension under the 2008 version of the statute. *Id.* In contrast to the pre-amendment version on which there was a split of authority as to whether a formal Congressional declaration of war was required, the post-2008 version "clearly contemplates these authorizations as triggering suspension." *Id.* at 1314.

Next, the *Arnold* court agreed with the majority of courts that the 2008 amended version of the WSLA applied to pre-amendment conduct as long as the original limitations period had not yet expired. *Id.* at 1314-15 ("The 'application of a statute of limitations extended before the original limitations period has expired does not violate the *Ex Post Facto* Clause'") (quoting *United States v. Grimes*, 142 F.3d 1342, 1351 (11th Cir. 1998); citing *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 602 (S.D.N.Y. 2013); *United States v. BNP Paribas SA*, 884 F. Supp. 2d 589, 608 (S.D. Tex. 2012)). Thus, the charges in the indictment at issue in *Arnold*, which were still timely as of the 2008 amendment of the WSLA, were tolled by the WSLA amendment unless, as provided for in the statute, there was a termination of hostilities. *Id.* at 1315. Quoting from a 2011 Florida case, the *Arnold* court noted that for charges "'for which the limitations period had expired prior to the effective date of the 2008 WSLA amendment, there is no suspension of the limitations period pursuant to the WSLA.'" *Id.* (quoting *United States v. Anghaie*, No. 1:09-CR-37-SPM/AK, 2011 WL 720044, at *2 (N.D. Fla.

Feb. 21, 2011)).  But for charges for which the limitations period would have lapsed *after* the

2008 WSLA amendment effective date, the limitations period would be suspended under the

WSLA.  *Id.*  Third, the *Arnold* court followed the majority of courts in concluding that there had

not been a termination of hostilities.  *Id.* at 1315-17.

Other cases have applied the 2008 amended WSLA retroactively.  *E.g.*, *United States v.*

*Frediani*, 790 F.3d 1196, 1200-01 (11th Cir. 2015) (applying 2008 version of the WSLA to

fraudulent conduct occurring in 2005 and 2006); *United States v. Rodriguez-Colon*, No. 15-647

(JAG), 2016 WL 3080778, at *1-2 (D.P.R. May 31, 2016); *United States v. Loman*, No. CR-12-

265-M, 2013 WL 1855876, at *1 (W.D. Okla. May 1, 2013).  The Government further argues

that the majority view is consistent with principles permitting retroactive application of a statute

of limitations because such statutes affect remedies or procedures and not substantive rights.  *See*

*Friel v. Cessna Aircraft Co.*, 751 F.2d 1037, 1039 (9th Cir. 1985) ("It is a rule of construction

that statutes are ordinarily given prospective effect.  But when a statute is addressed to remedies

or procedures and does not otherwise alter substantive rights, it will be applied to pending cases")

(footnote omitted); *see also Stogner v. California*, 539 U.S. 607, 617-18 (2003) (indicating that

Congressional extensions of a limitations period do not violate the Ex Post Facto Clause if the

limitations period has not fully run at the time Congress extends it; stating that "where courts

have upheld extensions of *unexpired* statutes of limitations . . ., they have consistently

distinguished situations where limitations periods have *expired*.  Further, they have often done so

by saying that extension of existing limitations periods is not *ex post facto* 'provided,' 'so long as,'

'because,' or 'if' the prior limitations periods have not expired.'").

Defendant observes that on their face, the 2008 WSLA amendments included no express

direction about retroactive application. This, Defendant argues, creates a presumption against retroactive application. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (describing a presumption against retroactive legislation as being "deeply rooted in our jurisprudence").

Defendant next relies on Ninth Circuit cases addressing retroactive application of statutes generally, to argue that the WSLA should not be applied retroactively here because it affects his substantive rights. For example, in *Tworivers v. Lewis*, 174 F.3d 987 (9th Cir. 1999), the court first noted that "[a]bsent clear legislative intent to the contrary, a presumption exists against retroactive application of new statutes." *Id.* at 993 (citing *Landgraf*, 511 U.S. at 265). Citing *Landgraf* again, the court suggested that three factors should be analyzed to determine whether a statute is retroactive: (1) whether the statute would impair rights a party possessed when he acted; (2) whether the statute would increase a party's liability for past conduct; or (3) whether the statute would impose new duties with respect to a transaction already completed. *Id.* In analyzing these three factors, the court applies "'ordinary judicial principles'" and relies on its "'sound instincts' to determine whether 'the new provision attaches new legal consequences to events completed before its enactment.'" *Id.* (quoting *Landgraf*, 511 U.S. at 269-70).

Defendant contends that his substantive rights will be affected by the retroactive application of the 2008 amendments in two ways. First, he argues that given that the United States military remains in Afghanistan and Iraq a full ten years after Congress amended the WSLA, the amended version of the statute effectively eliminates the statute of limitations for all major fraud crimes committed since 2001 involving the United States, even when such alleged crimes are unconnected to any military operations. This, Defendant contends, is more than a procedural change. It is a fundamental change to the law because instead of simply amending a

criminal limitations tolling statute, the 2008 WSLA amendments created a category of non-war-related crime that has no statute of limitations. I disagree. The WSLA is a tolling statute, not a substantive statute. The 2008 amendments did not alter the conduct proscribed under the Major Fraud Act and did not create liability for violations of that statute where there was none before. That the WSLA applies during what are effectively ongoing hostilities was a Congressional determination addressed to the length of time for which the underlying conduct could be prosecuted. This is appropriately viewed as a tolling statute and not a change to the substantive law. *See Frediani*, 790 F.3d at 1201 (in the context of analyzing arguments regarding the WSLA's requirement of a presidential proclamation to end hostilities, court rejected the defendant's contention that the requirement was "poor public policy" because it would lead to "indefinite tolling" of the statute of limitations).

Second, Defendant argues that the amended WSLA applies to a category of military conflicts of "non-declared wars" that were not covered by the WSLA in effect at the time of the alleged offense. In support of his argument, he relies on *Kellogg Brown & Root* for the proposition that the pre-2008 WSLA tolled the statute of limitations only when there was a formal declaration of war by Congress. With this understanding, Defendant argues that in 2002, there was no reason for him to believe that any of his conduct would ever be within the expanded "ambit" of the amended WSLA. He notes that nothing about his conduct should have signaled to him that he was affecting the United States's ability to both prosecute a war and adequately monitor its contracting for fraud, waste, and abuse.

As explained above, the Court in *Kellogg Brown & Root* expressly declined to resolve the "declaration of war" issue under the WSLA. Thus, the underlying premise of Defendant's

contention that as of 2002 he could not have anticipated that the WSLA would apply to his conduct, is not supported by the law. The law was uncertain. Accordingly, Defendant's position that the 2008 amendments create liability where there was none before is not accurate given the split of authority and differing statutory interpretations.

I agree with the Government that the charges are timely. The 2008 amended WSLA applies retroactively here because it is a tolling statute affecting the length of time that conduct may be prosecuted which did not affect or alter the underlying conduct proscribed by the Major Fraud Act. Because the charges in this case were still viable at the time the 2008 amended WSLA became effective, retroactive application is appropriate.

III. Due Process Violation Based on Pre-Indictment Delay

Defendant argues that even if the charges against him are timely under the statute of limitations, the sixteen-year delay period between the charged conduct and the Indictment is unconstitutional. "The Fifth Amendment guarantees that defendants will not be denied due process as a result of excessive pre-indictment delay." *United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007) (internal quotation marks omitted). While ordinarily, "any delay between the commission of a crime and an indictment is limited by the statute of limitations[,] [i]n some circumstances, however, the Due Process Clause requires dismissal of an indictment brought within the [statute of] limitations period." *Id.* (citation and internal quotation marks omitted).

Defendant must satisfy a two-part test to show that his Fifth Amendment due process rights have been violated and justify dismissal of the Indictment for unconstitutional pre-indictment delay. *United States v. Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005). A "defendant

must prove that he suffered actual, non-speculative prejudice from the delay, meaning proof that demonstrates exactly how the loss of evidence or witnesses was prejudicial." *Id.* (internal quotation marks omitted). "The defendant's burden to show actual prejudice is heavy and is rarely met." *Id.* "Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice." *Corona-Verbera*, 509 F.3d at 1112 (internal quotation marks omitted). The "proof must demonstrate by definite and non-speculative evidence how the loss of a witness or evidence is prejudicial to his case." *Id.* (internal quotation marks and brackets omitted).

"The second part of the test applies only if the defendant has demonstrated actual prejudice." *Barken*, 412 F.3d at 1134; *see also Corona-Verbera*, 509 F.3d at 1112 (the second prong of the test applies only if the defendant establishes actual prejudice). In the second part, "the [length of] delay is weighed against the reasons for it, and the defendant must show that the delay offends those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Barken*, 412 F.3d at 1134 (internal quotation marks omitted).

A. Prejudice

Defendant argues that the delay has prejudiced him in "multiple respects." Def.'s Mot. 12, ECF 34. He cites to the loss or destruction of relevant Company A documents, the inability of witnesses to recall the events of each sale, and the loss of records regarding vacation.

Defendant notes that the Government's case is built largely on alleged handwritten alterations to test results in the packages of records associated with the sale and shipment of aluminum extrusions to various customers, including the specific sales and shipments to Customers A and C in May 2002. But, Company A informed the Government that under the

document retention policy in effect before the receipt of the Government's April 2013 subpoena for records, the required retention period was seven years. Therefore, documents dated before 2006 may no longer be available. Company A also told the Government that documents may have been misplaced, misfiled, or otherwise lost in the ordinary course of business.

Defendant states that consistent with this representation, the packages of documents for various sales and shipments of aluminum extrusions that were produced by Company A are not uniformly complete on their face and some packages contain more records than others. As a result, Defendant argues that it is impossible to know whether individual packages of materials that the Government may rely on are in fact complete, or whether they are missing exculpatory materials such as subsequent test results for the same material or subsequent instructions to scrap the material before shipment that would undermine any suggestion of fraud.

Defendant observes that it has been more than sixteen years since the specific alterations cited in the Indictment and more than twenty years since the date the Government alleges the relevant "scheme and artifice" began. Defendant argues that this means it is impossible for Defendant or any other witnesses to recall the events of each independent sale or shipment in a manner that would allow them to testify to any specific exculpatory events that may have occurred relating to such sales or shipments. He argues that witnesses cannot recall, for example, how many of the "alterations" may have resulted from simply correcting a number that was written incorrectly in the first place. He adds that this is further complicated by the "sheer number" of alterations on which the Government seeks to rely. He notes that the Indictment itself alleges that the scheme and artifice involved hundreds of alterations over a ten-year plus period. According to Defendant, the Government will seek to introduce summary exhibits for

more than 5,000 pages of documents relating to the alleged alterations. He argues that the difficulties in challenging such evidence in light of the incomplete nature of the records and inability of witnesses to recall any of the specific events is overwhelming and "clearly prejudicial." Def.'s Mot. 14.

As to vacation records, Defendant argues that the delay has prejudiced his ability to defend himself by showing that he was on vacation and therefore could not have authorized transmission of the May 20, 2002 test certifications which are the basis of the charges against him. According to Defendant, he normally takes an annual fishing vacation in the second half of May, the same time-frame as the charged offense. Because of the passage of time, he has been unable to obtain documentation of the timing of his vacation in 2002. His Company A personnel file is incomplete, containing only nineteen pages that had no information on his leave or vacation time, despite nearly forty years of service there. He asserts that payroll records also fail to show all of the vacation time he took in May 2002. He was unable to secure any other records from either the place he stayed or through his credit card company, both of which indicated that they had no relevant records going back to 2002.

In response, the Government argues that Defendant's allegations of prejudice are speculative. As to the unavailable Company A records, the Government states that Defendant's argument is nothing more than how *potentially* missing documents *might* show an innocent explanation. The Government notes that while it is difficult to conceive of any scenario in which Defendant would have innocently altered test results, his explanation that alterations *may* have occurred from correcting a number that was initially written incorrectly is only speculative. Defendant does not assert that this ever occurred and, according to the Government, his assertion

makes no sense because Defendant did not oversee or work in either of the testing labs where the results would have been "written incorrectly in the first instance" such that Defendant would have been in a position to innocently correct numbers. As to Defendant's suggestion that the records might contain subsequent test results which might be exculpatory, the Government asserts that this fails to explain how such actions taken after the fact make the alteration in the first instance necessary or innocent.

Next, the Government states that as for the certifications alleged in Counts One and Two occurring in May 2002, it is unlikely that any records containing exculpatory documents existed or were lost. The final testing of the two orders occurred at External Lab A, and neither External Lab A nor Company A have any records of any additional testing completed on the aluminum extrusions involved. Moreover, the yield, tensile strength, and elongation results printed on the test certificate and sent to Customer A match the results contained in the visibly altered External Lab A test sheet. Therefore, the Government argues it is unlikely there was any change from the altered test sheets and certificates shipped to the government contractor and subcontractor.

Even if Defendant could identify missing categories of potentially exculpatory evidence, the Government notes that "[g]eneralized assertions of the loss of . . . evidence are insufficient to establish actual prejudice." *United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995). The Government states it is unclear how many records, if any, were destroyed or lost due to Company A's retention policies. Also, it is unclear whether the loss of those records is more prejudicial to Defendant, the Government, or not prejudicial at all. *See United States v. Dudden*, 65 F.3d 1461, 1466 (9th Cir. 1995) (finding that the defendant's allegation of lost records did not establish actual prejudice because the defendant did not know how the records would have been

exculpatory and lost records "might well have supported the prosecution's case.").  As to fading memories of witnesses, the Government argues that Defendant makes no attempt to establish what the witnesses might have testified to if their recollections had not faded, how the testimony would aid in Defendant's defense, or how the witnesses' memories about the orders in question would have been any better had the Government sought the Indictment sooner  Additionally, the Government notes that T.G., a Company A administrative assistant supervised by Defendant, identified Defendant's handwriting on testing sheets containing alterations and dated throughout May 2002.  Two other Company A employees supervised by Defendant, R.K. and K.G., both identified Defendant's handwriting on the testing alteration in question from a test sheet on May 17, 2002.

The Government argues that Defendant's assertions that missing records would show he took an annual fishing trip and regularly took vacations in late May are also speculative because it is unclear if the records of such a vacation ever existed.  The Government states that Company A payroll records indicate that Defendant was not on vacation during the time in question.  Those records, moreover, which date back to July 1996, show Defendant took a vacation in May in only three years:  1999, 2004, and 2005.  While it may be that for some unexplained reason, not all of his paid vacation is reflected in the payroll records, the Government notes that Defendant offers no reason why these records fail to show all of the time.  As a result, the Government argues that Defendant cannot meet his heavy burden of establishing actual prejudice.

I agree with the Government.  Defendant's assertions are largely suppositions:  there might be records showing subsequent test results or there might have been alterations caused by correcting an incorrect number.  His contentions about what Company A's documents might

show contain a fair amount of speculation. Additionally, I agree with the Government that missing documents which might reveal re-testing of some samples would not likely be relevant because these documents do not disprove that other records were altered.

The same is true of the witnesses. Defendant names none. He generally asserts that memories have faded and suggests that without the delay, witnesses might have been able to testify with some specificity about the testing records. As stated above, "generalized assertions" regarding "the loss of memory or witnesses, or evidence are insufficient to establish actual prejudice." *Corona-Verbera*, 509 F.3d at 1112 (internal quotation marks omitted).

As to the vacation records, the actual payroll records from Company A do not support Defendant's assertion that he regularly took vacation in May and thus, he speculates that the existence of other personnel records would create a question as to whether he was there. The cover letter transmitting the payroll records does not indicate that payroll records, as opposed to his personnel file more generally, were incomplete. *See* Ex. 7, Carbone Decl., ECF 35 at 75 ("In response to your August 8, 2016 request for records from 1996 until 2006 documenting when Denny Merkel took leave from work, [Company A] reviewed payroll records for Merkel, which were available dating back to July 1996, and we are producing records indicating those payroll periods for which Merkel received vacation pay . . . Specifically, those records indicate that Merkel received vacation pay during the following eight pay periods from May 1999 to October 2006:").

Defendant does not support his prejudice argument with "definite and non-speculative evidence" as to how the "loss of a witness or evidence is prejudicial to his case." *Corona-Verbera*, 509 F.3d at 1112 (internal quotation marks omitted). Instead, he relies on speculative

assertions about what evidence or unspecified witnesses might have been able to prove. Defendant fails to meet his high burden to show actual and substantial prejudice.

B. Fundamental Conceptions of Justice

Although I need not address the second element regarding fundamental fairness given my finding that Defendant fails to show prejudice, I do so to fully articulate my bases for denying Defendant's motion. Defendant argues that sixteen years is an unusually long delay in a fraud case. He states that the Government will be unable to point to any factors that justify its delay in discovering, investigating, and prosecuting this case. He anticipates that the Government will argue that delay occurred because it did not begin investigating until after the 2009 and 2011 failures of NASA rocket launches that allegedly included frangible joints from Plant A. But, he argues, the Government will be unable to show why, even if it did not begin investigating until after 2011, it took an additional seven years to bring the charges in this case.

The Government notes that if the court reaches this balancing part of the two-part test, Defendant must show that the "delay was caused by culpable actions of the government." *United States v. Loud Hawk*, 816 F.2d 1323, 1325 (9th Cir. 1987); *see also United States v. Tornabene*, 687 F.2d 312, 317 (9th Cir. 1982) (a defendant must show "an[] intentional or negligent delay for improper purposes by the government"). And, if the government conduct alleged is negligent conduct, the delay or prejudice must be greater than in cases where reckless or intentional government conduct is at issue. *United States v. Moran*, 759 F.2d 777, 782 (9th Cir. 1985).

The Government explains the history of its investigation in this case, starting with the 2009 and 2011 failure of two NASA rockets containing Company A aluminum extrusions produced for Customer A. NASA was unable to recover the rockets which made the internal

investigation into the failures challenging.  Finally, in May 2012, the NASA Office of Inspector General (NASA-OIG) opened a civil investigation into Company A.  Even at this point, however, NASA-OIG was unaware that any Company A employees had altered test results.  In April 2013, NASA-OIG and "DCIS" interviewed Defendant who denied having knowledge of below-standard aluminum extrusions being manufactured, certified, and sold to Customer A while he was plant manager.  Instead, Defendant asserted that Company A scrapped the whole lot of material if it failed testing.  Also in April 2013, NASA-OIG issued a subpoena to Company A for testing records related to Customer A purchase orders, among other things.  Company A outside counsel began an internal investigation but no Company A employee disclosed the presence of a testing alterations scheme.  Initially, Company A produced black and white scans of testing records, which made it difficult to detect the handwritten alterations as they were often made in colored ink or using white-out.  Finally, in October 2014, Company A disclosed the handwritten alterations and made the originals of the testing records available for review.

As a result of the civil investigation, the Fraud Section opened a criminal investigation in July 2015.  Several months later, counsel for Company A disclosed that tensile testing alterations were ongoing on a computerized system in the main plant lab.  The investigative team worked to obtain the computerized testing alteration data, review emails, and conduct further interviews. The Government's investigation continued, and included roughly 150 interviews and the collection of approximately 2.5 million pages of relevant documents, many of which were highly technical.  Two years later, in July 2017, former lab supervisor Dennis Balius pleaded guilty to one count of mail fraud for conduct related to the computerized alterations.  In October 2017, the Government contacted Defendant's counsel to explore a resolution of the criminal investigation.

Those discussions continued until March 2018. The Indictment was returned on April 17, 2018.

The Government argues that it has not been idle but instead, has made reasonable efforts to investigate a complex fraud scheme with potential far-reaching implications. The Government notes that even assuming that it indicted the case six months after the first NASA rocket crash in February 2009 and before there was any indication of wrongdoing on the part of Company A employees, this was still outside of the seven-year document retention policy for Company A and the witness's memories about the orders likely were diminished even at that point.

Finally, the Government argues that even if it was negligent in its delay, which it maintains it was not, the length of the delay when balanced against the reason for the delay, does not offend "those fundamental conceptions of justice which lie at the base of our civil and political institutions." The Government notes that Defendant himself recognized that the case was the result of a complex and time-consuming investigation, by stating, in his Motion for Complex Case Designation, that the "indictment [was] the culmination of a multi-year investigation by multiple federal agencies." Def.'s Unopp. Mot. for Complex Case Designation 2, ECF 14. Additionally, Defendant, in support of that motion, noted that the "amount of discovery that has already been provided and that remains to be conducted is enormous." *Id.* (stating that to date, the government had produced 819,540 documents comprising 2,417,493 pages, together with a sizeable database that includes years of test results). The Government notes that the case involves technical information regarding metallurgy, specifications, rocket science, and the aluminum extrusion process which required consultation with a variety of subject matter experts. And, the Government continues, neither the volume of relevant materials nor the complexity of the facts adequately captures the difficulties faced by the investigative

team.  The purpose of the conspiracy itself (to conceal failing tensile test results from Company A's customers), was to make it difficult for anyone to detect the fraud.  And, many of the witnesses misled the initial internal investigation by Company A, thereby delaying discovery and reporting of the misconduct to the Government.

The Government argues that the case was indicted as soon as the Government secured and evaluated the necessary evidence.  There was less than a three-year delay between the start of the criminal investigation and the Indictment which was neither unnecessary nor unreasonable. In the end, the Government argues, the pre-indictment delay was reasonable and was due to a time-consuming and complex investigation, and did not prejudice Defendant nor offend the fundamental conceptions of justice.

In Reply, Defendant focuses on two things: (1) the fact that the delay from chargeable conduct to Indictment is sixteen years which he contends is extraordinary, and (2) that the Government fails to explain why, even though it began investigating the rocket launch failures in 2011, it took an additional seven years to put together a criminal case.  As to the latter point, Defendant adds that the fact that an investigation did not begin as a criminal investigation is not a sufficient basis for an extraordinary delay in seeking indictment.

I agree with the Government.  First, even Defendant does not seriously assert that the time period before the initiation of an investigation in 2011 following the second rocket failure was unreasonable government delay.  Thus, while sixteen years is an extraordinary period of time, the proper period of time to examine is seven years, from 2011 to the 2018 indictment. Second, the Government does explain why it took many years after 2011 to bring charges against Defendant.  This investigation was document heavy and factually complex.  Interviewees hid the

truth.  The subject matter was technical.  Third, while the investigation was lengthy, Defendant

does not suggest that the delay was intentional or reckless or that the Government used the delay

to gain a tactical advantage.  On balance, in considering the length of the delay against the

reasons for it, Defendant fails to establish that the delay offends the "fundamental conceptions of

justice which lie at the base of our civil and political institutions." *Barken*, 412 F.3d at 1134

(internal quotation marks omitted).  With this conclusion, I do not by any means suggest that a

sixteen-year passage of time between the charged conduct and an indictment is constitutional in

any other case.  Instead, my conclusion on the fundamental fairness issue is limited to the

unusual facts which occurred here.

## CONCLUSION

Defendant's motion to dismiss based on the statute of limitations and pre-indictment

delay [32, 34][1] is denied.

IT IS SO ORDERED.

Dated this ____4____ day of ____January____, 2019

Marco A. Hernandez
United States District Judge

___
[1] ECF 32 is the sealed, unredacted version of the motion filed at ECF 34.